UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAWN WANG,

     Plaintiff,

                                 Civil Case No. 18-10347
v.                             Honorable Linda V. Parker

GENERAL MOTORS, LLC and
GM (CHINA) INVESTMENT CO., LTD.,

        Defendants.
_____/

## **OPINION AND ORDER DENYING DEFENDANT GM (CHINA) INVESTMENT CO., LTD.'S MOTION TO DISMISS PURSUANT TO FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2) AND 12(b)(6)**

In this lawsuit, initiated on January 30, 2018, Plaintiff asserts the following claims against Defendants: (i) age discrimination in violation of the federal Age Discrimination and Employment Act ("ADEA"); (ii) age discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"); (iii) race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); and (iv) race and national origin discrimination under the ELCRA.[1]  Defendants are General Motors, LLC ("GM") and GM (China) Investment Co., Ltd. ("GMCIC").  The matter is presently before the Court on

---

[1] Plaintiff also asserted a race and ethnic discrimination claim against Defendants under 42 U.S.C. § 1981, but the Court dismissed the claim when ruling on General Motor LLC's previously filed motion to dismiss.  (*See* ECF No. 34.)

GMCIC's Motion to Dismiss Pursuant to Federal Rules of Civil Procedure

12(b)(2) and (6).  (ECF No. 58.)  The motion has been fully briefed.  (ECF Nos.

60, 61.)  Finding the facts and legal arguments sufficiently presented in the parties'

briefs, the Court is dispensing with oral argument pursuant to Eastern District of

Michigan Local Rule 7.1(f).

## I.    Applicable Standard of Review

In its motion, GMCIC argues that the Court lacks personal jurisdiction over

it and, alternatively, that Plaintiff's claims against it fail as a matter of law.

GMCIC's first argument is governed by Federal Rule of Civil Procedure 12(b)(2)

and its second argument by Rule 12(b)(6).

A court may decide a motion to dismiss for lack of personal jurisdiction by

relying "'upon the affidavits alone … permit[ting] discovery in aid of deciding the

motion[,] or … conduct[ing] an evidentiary hearing to resolve any apparent factual

questions.'"  *Anwar v. Dow Chem. Co.*, 876 F.3d 841, 847 (6th Cir. 2017) (quoting

*MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 899 (6th Cir. 2017)).  The

plaintiff has the burden of establishing the court's jurisdiction over a defendant.

*Id*.  Where the court decides the motion without an evidentiary hearing, the

plaintiff's "burden is relatively slight[.]"  *Id.* (internal quotation marks and

citations omitted).  "'To defeat dismissal in this context, plaintiffs need make only

a prima facie showing that personal jurisdiction exists.'"  *Id.* (quoting *MAG IAS*

*Holdings*, 854 F.3d at 899) (citing *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007)).

The court must consider the pleadings and affidavits "'in a light most favorable to the plaintiff,' without weighing 'the controverting assertions of the party seeking dismissal.'" *Anwar*, 876 F.3d at 847 (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991)).  While the defendant's motion should be denied if the plaintiff makes a prima facie showing, "the defendant's avenues to contest personal jurisdiction are not foreclosed[.]"  *Id.*  "'[T]he defendant can continue to contest personal jurisdiction by requesting an evidentiary hearing or moving for summary judgment should the evidence suggest 'a material variance from the facts' as presented by plaintiffs.'"  *Id.* (quoting *MAG IAS Holdings*, 854 F.3d at 899) (quoting *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893 (6th Cir. 2002)).

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a

3

probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption, however, is not applicable to legal conclusions. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

## II. Factual and Procedural Background

### A. Plaintiff and His GM/GMCIC Employment

Plaintiff was born in China. (Pl.'s Aff. ¶ 3, ECF No. 60-4 at Pg ID 1266.) He became a naturalized United States citizen in 1999, and currently maintains only U.S. citizenship. (*Id.*)

In February 1989, Plaintiff began working for GM in Canada. (*Id.* ¶ 4, Pg ID 1266.) In 1991, GM transferred Plaintiff's employment to the United States. (*Id.* ¶5, Pg ID 1266.) Plaintiff resided in Clarkston, Michigan. (*See id.* ¶ 6, Pg ID 1267.) On or about July 1, 2009, GM transferred Plaintiff to a new job assignment at GMCIC. (*Id.* ¶ 6, Pg ID 1267.) The position was in Shanghai, China. (*Id.*)

The letter offering Plaintiff the position in China was on letterhead displaying the GM logo, referenced the "GMCIC Group," and stated: "General Motors is the world's largest automotive manufacturer with aggressive growth plans for China . . . join our fast growing China team."  (Am. Compl. ¶ 12, ECF No. 43 at Pg ID 1051.)  As a United States citizen, Plaintiff was required to have a work visa and resident permit to work in China.  (Pl.'s Aff. ¶ 8, ECF No. 60-4 at Pg ID 1267.)  GM's Director of Engineering and Director of Human Resources managed Plaintiff's transfer to GMCIC.  (*Id.* ¶ 7, Pg ID 1267.)

Plaintiff's employment contract with GMCIC incorporated an Intellectual Property Rights Agreement.  (Pl.'s Aff. Ex. A, ECF No. 60-4 at Pg ID 1274-1299.) This agreement related to Plaintiff's relationship with *GM*, providing *inter alia* that he assigned the intellectual property developed during his employment to *GM*, would keep *GM* information confidential, and not accept employment with an entity that competes with *GM*.  (*Id.*)  The agreement also contains a choice of law provision which states that the laws of Michigan govern.  (*Id.* at Pg ID 1278.)

Plaintiff paid United State federal and Michigan State taxes while working in China.  (*Id.* ¶ 9, Pg ID 1267.)  GM managed Plaintiff's taxes through KPMG until 2012.  (*Id.*)  From 2012 until 2017, Plaintiff paid his federal and state taxes himself.  (*Id.*)

On or about August 1, 2015, Charon Morgan became Director of Engineering at GMCIC and, in that capacity, was Plaintiff's immediate supervisor. (Am. Compl. ¶ 15, ECF No. 43 at Pg ID 1051.)  Plaintiff believes that Ms. Morgan's supervisor was Tobias[2] Suenner, GMCIC's Vice President for Vehicle Engineering, who in turn reported to Kenneth L. Kelzer, who worked in the United States as GM's Vice President of Global Vehicle Components and Subsystems. (*Id*. ¶ 16, Pg ID 1051-52; *see also* Pl.'s Aff. ¶ 27, ECF No. 60-4 at Pg ID 1270 & Ex. C.)

On or about January 24, 2017, Ms. Morgan and Grace Zheng, GMCIC's Human Resources Manager, informed Plaintiff that he was going to be mandatorily retired on July 3, 2017, when he turned sixty years old.  (Am. Compl. ¶ 19, ECF No. 43 at Pg ID 1052.)  Plaintiff objected, noting that David Reeck, a colleague who was transferred to GMCIC around the same time as Plaintiff, worked in China for GMCIC until he was sixty-five years old.  (*Id*. ¶ 20, Pg ID 1052.)  Plaintiff believes Mr. Reeck, who is a male Caucasian, is a United States Citizen and not of Chinese national origin.  (*Id*. ¶ 21, Pg ID 1052.)  At a subsequent meeting with Ms. Morgan on February 17, 2017, Plaintiff tried to reverse the decision to mandatorily retire him.  (*Id*. ¶ 22, Pg ID 1052.)  In response, Ms. Morgan analogized Plaintiff's

---

[2] Plaintiff refers to this individual as "Toblas" Suenner in the Complaint; however, documentation submitted to the Court indicates that the correct name is "Tobias."  (*See, e.g.,* Pl.'s Aff. Ex. C at 3, ECF No. 60-4 at Pg ID 1303.)

situation to Kevin Wang, a locally hired engineer manager who was a Chinese citizen.  (*Id*. ¶ 23, Pg ID 1053.)

On February 23, 2017, Plaintiff sent Ms. Morgan an email, stating that the decision to mandatorily retire him at age sixty contradicted a company memorandum he became aware of in 2009, when he transitioned to his job position in China.  (*Id*. ¶ 24, Pg ID 1053.)  Ms. Morgan responded to Plaintiff's email on February 24, 2017, "clarify[ing] that there's no business needs to extend your employment after your legal retirement age in China which is 60 years old according to applicable China law."  (*Id*. ¶ 26, Pg ID 1053.)

In an email to Ms. Morgan and Ms. Zheng on March 13, 2017, Plaintiff disputed Ms. Morgan's claim that there was no business need to retain him, pointing out that there was a posting for Plaintiff's same and/or similar position already on "GM Global Internal Jobs."  (*Id*. ¶ 28, Pg ID 1054.)  The following day, Ms. Zheng responded, asserting that "business need" refers to the continuation of employment of the employee, not the job position.  (*Id*. ¶ 32, Pg ID 1055.)

On May 16, 2017, Ms. Morgan and Ron Fraser authored a mass email using the GM logo announcing that Plaintiff "will retire after 28 years of service."  (*Id*. ¶ 32, Pg ID 1055.)  Plaintiff believes that Mr. Fraser is a GM Director, who works in Detroit, Michigan.  (*Id*. ¶ 34, Pg ID 1055; *see also* Pl.'s Aff. ¶ 32, ECF No. 60-4 at Pg ID 1271.)  The email from Ms. Morgan and Mr. Fraser also announced that

Gregory Schone had been appointed as the new manager of GM China

Engineering Laboratories and would be relocating to Shanghai, China. (Pl.'s Aff.

¶ 33, ECF No. 60-4 at Pg ID 1272.) Plaintiff believes that Mr. Schone is a

substantially younger Caucasian who had been working for GM in the United

States. (*Id*.)

On July 1, 2017, Plaintiff was involuntarily retired. (Am. Compl. ¶ 36, ECF

No. 43 at Pg ID 1055.) He thereafter returned to his home in Clarkston, Michigan

(Pl.'s Aff. ¶ 6, ECF No. 60-4 at Pg ID 1267), and filed a charge of discrimination

with the Equal Employment Opportunity Commission ("EEOC"). (Am. Compl.

¶ 38, ECF No. 43 at Pg ID 2, 6.) The EEOC issued a right-to-sue letter on January

17, 2018. (*Id*.) As indicated, Plaintiff initiated this lawsuit a short time later, on

January 30, 2018.

### B.   The Relationship Between GM and GMCIC

GMCIC was established in China in 1998 pursuant to China's laws and

regulations. (Treme Decl. ¶ 3, ECF No. 58-1 at Pg ID 1181.) GMCIC's activities

are governed by the laws of China. (*Id*.) Mr. Treme, former HR Director for

GMCIC, states that GMCIC is a subsidiary of General Motors China LLC, which

in turn is a subsidiary of GM Global Holdings GmbH & Co KG, a subsidiary of

General Motors Holdings LLC. (*Id*. ¶ 5, Pg ID 1181.) According to Mr. Treme,

GMCIC was not capitalized by GM, receives no financial assistance or support

8

from GM, and operates with total financial independence from GM.  (*Id.* ¶ 4, Pg ID 1181.)  Mr. Treme indicates that GMCIC and GM have separate bank accounts and funds, maintain separate corporate and financial records, and have separate boards of directors.  (*Id.* ¶¶ 6, 7, Pg ID 1181.)  He further indicates that the building housing GMCIC's headquarters is not shared with any other entity.  (*Id.* ¶ 2, Pg ID 1181.)

In its most recent Form 10-K submission to the Securities and Exchange Commission, however, GM lists GMCIC under the category of "Subsidiaries and Joint Ventures."  (Pl.'s Aff. Ex. I, ECF No. 60-4 at Pg ID 1335.)  GM's media website lists GMCIC as a "Wholly Owned Foreign Enterprise" and describes GMCIC as "a wholly owned venture based in Shanghai" that "houses all of GM's local staff and is an investor in GM's vehicle joint ventures in China."  (Pl.'s Resp. Ex. 13, ECF No. 60-14.)  The sign in front of the building where GMCIC is located displays the GM logo and reads "General Motors" above "International Operations and China Headquarters".  (Pl.'s Aff. Ex. G, ECF No. 60-4 at Pg ID 1330.)

According to Mr. Treme, GMCIC's Board of Directors is responsible for all aspects of the company's affairs.  (*Id.* ¶ 7-10, Pg ID 1181-82.)  He attests that determinations concerning employment matters (e.g. hiring, transfers, dismissals, resignations, wages) are made by GMCIC's Board of Directors or departments or

persons authorized and designated by the board.  (*Id*. ¶ 10, Pg ID 1182.)  Mr.

Treme does not indicate who serves on GMCIC's Board of Director's, however.

Defendant does not otherwise provide this information.

GMCIC's President is Matt Tsien, who also holds the title of Executive Vice

President of GM.  (Pl.'s Aff. ¶ 31, ECF No. 60-4 at Pg ID 1271.)  Mary Barra,

GM's Chairman and CEO, is identified as the top of the "Leadership" of GM

China.  (Pl.'s Aff. Ex. F, ECF No. 60-4 at Pg ID 1327.)

Mr. Treme claims that GMCIC's human resources department operates

autonomously from GM.  (*Id*. ¶ 12, Pg ID 1183.)  Plaintiff maintains, however, that

GMCIC's Human Resources reports to GM's Human Resources in Michigan.

(Pl.'s Aff. Ex. C, ECF No. 60-4.)  While HR Director, Mr. Treme reported directly

to individuals at GM in Michigan.  (*Id*.)  As Plaintiff points out, Mr. Treme does

not state in his affidavit whether he is a GM or GMCIC employee.  Nor does Maria

Mora Vinueza, who took over as GMCIC's HR Director in August 2018.  (Vinueza

Aff., ECF No. 58-2.)

Plaintiff believes that GM appoints all of GMCIC's senior managers.  (Pl.'s

Aff. ¶ 24, ECF No. 60-4 at Pg ID 1270.)  Most, if not all, of GMCIC's senior

managers are "International Service Personnel" ("ISPs") who are temporarily

assigned to GMCIC but remain employees of GM.  (*Id*. ¶ 25, Pg ID 1270.)  The

"home" units for all of GMCIC's senior managers, including Ms. Morgan and

Robert Treme, are within GM in the United States.  (Pl.'s Aff. ¶ 26, ECF No. 60-4 at Pg ID 1270.)  For example, Matt Tsien, President of GMCIC, is listed as a senior leader of GM in Detroit, Michigan.  (*Id.*)

Plaintiff's salary was paid in Chinese Yuan, the official currency of China.  (Treme Aff. Exs. B, C, ECF No. 58-1 at Pg ID 1190, 1192-93.)  Plaintiff indicates, however, that his salary "was a direct exchange from [his] US salary according to the exchange rate at the time, not according to the local standard."  (Pl.'s Aff. ¶ 12, ECF No. 60-4 at Pg ID 1268.)  Moreover, as the letter offering Plaintiff his position with GMCIC reflects, he retained his corporate GM employee level.  (Treme Aff. Ex. B, ECF No. 58-1 at Pg ID 110.)  Additionally, all GMCIC employees have GM identifications and email addresses.  (*Id.* ¶ 22, Pg ID 1270.)  Therefore, Plaintiff's ID and email address did not change when he was transferred to China.  (*Id.*)

Maria Mora Vinueza, who has served as the HR Director of GMCIC since August 1, 2018, attests that "GMCIC does not transact any business with Michigan."  (Vinueza Aff. ¶ 5, ECF No. 58-2 at Pg ID 1202.)  Plaintiff avers, however, that his job responsibilities with GMCIC required him to frequently interact with GM employees and travel to GM's offices in the United States, including Michigan.  (Pl.'s Aff. ¶¶ 13-17, ECF No. 60-4 at Pg ID 1268.)  According to Plaintiff, GMCIC manages the supplier quality of imported

automotive parts for GM's plants in the United States, including Michigan, valued at hundreds of millions of dollars annually. (*Id*. ¶ 15, Pg ID 1268.) The laboratories Plaintiff managed at GMCIC interacted with more than twenty GM laboratories in Michigan, sharing common processes and resources and exchanging equipment. (*Id*. ¶ 17, Pg ID 1268.) In 2016, for example, Plaintiff traveled to Michigan six times to work with GM teams, at which time he stayed in his Clarkston, Michigan residence. (*Id*.)

GM engineering in the United States specified the equipment used in GMCIC's laboratories, much of which was purchased in the United States and some of which was shipped directly from GM labs in Michigan. (*Id*. ¶ 18, Pg ID 1269.) Plaintiff's lab in China was part of GM's engineering organization in the United States. (*Id*. ¶ 19, Pg ID 1269.) GM determined Plaintiff's budget and controlled his spending. (*Id*.)

### C. GM's Motion to Dismiss and the Court's Ruling

In response to Plaintiff's initial complaint, GM filed a motion to dismiss in which it sought dismissal of Plaintiff's claims against it on the basis that GMCIC is a foreign company that GM does not control. (*See* Op. and Order at 7, ECF No. 34 at Pg ID 875.) Applying the Sixth Circuit's factors for deciding whether two entities should be regarded as a single employer subject to joint liability for

12

employment-related acts (*see id*. at 8, Pg ID 876),[3] the Court found sufficient facts

to conclude that Plaintiff plausibly supported his assertion that GM controls

GMCIC.  (*Id*. at 12, Pg ID 880.)  The Court determined, for purposes of the motion

to dismiss, that GM and GMCIC are a single employer.  (*Id*.)

## III.   Applicable Law and Analysis

### A.     Whether the Court has Personal Jurisdiction Over GMCIC

"Where a federal court's subject matter jurisdiction over a case stems from

the existence of a federal question, personal jurisdiction over a defendant exists 'if

the defendant is amenable to service of process under the [forum] state's long arm

statute and if the exercise of personal jurisdiction would not deny the defendant

due process.'"  *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (quoting *Mich.*

*Coalition of Radioactive Material Users, Inc v. Griepentrog*, 954 F.2d 1174, 1176

(6th Cir. 1992)).  "To comply with due process, a court's exercise of its power over

an out-of-state defendant must 'not offend traditional notions of fair play and

substantial justice.'"  *Indah v. U.S. Sec. & Exchange Comm'n*, 661 F.3d 914, 920

---

[3] Those factors are: "(A) the interrelation of operations; (B) the common management; (C) the centralized control of labor relations; and (D) the common ownership or financial control, of the employer and the corporation."  42 U.S.C. § 2000e-1(c)(3); 29 U.S.C. § 623(h)(3); *see also Ambruster v. Quinn*, 711 F.2d 1332, 1337 (6th Cir. 1983), abrogated on other grounds in *Arbuagh v. Y & H Corp.*, 546 U.S. 500 (2006); *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). The factors are flexible and no single factor is determinative.  *Ambruster*, 711 F.3d at 1337-38; *Murray*, 74 F.3d at 404.

(6th Cir. 2011) (quoting *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945))

(additional quotation marks and citation omitted).

Michigan's long-arm statute extends both general and limited jurisdiction

over resident individuals and corporations.  See Mich. Comp. Laws § 600.701

(general, individuals); Mich. Comp. Laws § 600.705 (limited, individuals); Mich.

Comp. Laws § 600.711 (general, corporations); Mich. Comp. Laws § 600.715

(limited, corporations).  The following relationships between a corporation and the

State are sufficient to establish general personal jurisdiction: (1) incorporation

under the State's laws; (2) consent; or (3) "[t]he carrying on of a continuous and

systematic part of its general business within the [S]tate." *Id*. § 600.711.  Limited

personal jurisdiction occurs where the lawsuits arises out of an act by the

defendant, for example "[t]he transaction of any business within the [S]tate[]" or

doing an act in the state resulting in an action for tort. *Id*. § 600.715.  Michigan's

long-arm statute is coextensive with due process "if the particular acts or status of

a defendant first fit within a long-arm statute provision." *Green v. Wilson*, 565

N.W.2d 813, 816 (Mich. 1997).

"Personal jurisdiction can be either general or specific, depending upon the

nature of the contacts that the defendant has with the forum state." *Bird*, 289 F.3d

at 873.  "For an individual, the paradigm forum for the exercise of general

jurisdiction is the individual's domicile; for a corporation, it is an equivalent place,

14

one in which the corporation is fairly regarded as at home … the place of

incorporation and principal place of business are paradigm bases for general

jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (internal

quotation marks, citation, ellipses and brackets removed).  The corporation's

"affiliations with the State" must be "'so 'continuous and systematic' as to render

it essentially at home in the forum State."  *Id.* at 139 (brackets removed) (quoting

*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

"Specific jurisdiction, on the other hand, depends on an affiliation between the

forum and the underlying controversy, principally, activity or an occurrence that

takes place in the forum State and is therefore subject to the State's regulation."

*Goodyear*, 564 U.S. at 919 (internal quotation marks, brackets, and citation

omitted).

Plaintiff does not contend that GMCIC independently engaged in activities

in Michigan or maintained a relationship with the State sufficient to satisfy

Michigan's long-arm statute or due process.  Rather, Plaintiff relies on GM's

contacts and relationship with Michigan, which he claims renders GMCIC

amenable to suit in the forum because GM controls GMCIC.

The Sixth Circuit has adopted the alter-ego theory of personal jurisdiction,

which "provides that a non-resident parent corporation is amenable to suit in the

forum if the parent company exerts so much control over the subsidiary that the

15

two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). While the alter-ego theory is more often discussed in cases where the parent is the non-resident over whom jurisdiction is sought based on its subsidiary's contacts with the forum, if the plaintiff proves "that the parent controls the day-to-day operations of the subsidiary such that the subsidiary can be said to be a mere department of the parent[,] … a court may exercise personal jurisdiction over either the parent or the subsidiary based on the other's connections to the forum." *Simeone ex rel. Estate of Albert Francis Simeone, Jr. v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 676-77 (E.D. Pa. 2005) (finding Austrian-based manufacturer of aircraft engine involved in plane crash subject to personal jurisdiction under alter-ego theory based on parent company's contacts with the forum); *Motown Record Co., L.P. v. iMesh.com, Inc.*, No. 03 Civ 7339, 2004 WL 503720, *4 (S.D.N.Y. Mar. 12, 2004) (concluding that Israeli subsidiary was subject to personal jurisdiction under the alter-ego theory based on its parent's systematic and continuous contacts with the forum); *see also* David M. Holliday, Am. Law of Prod. Liab. 3d Treatise § 48:96 ("Under the alter ego theory of jurisdiction, personal jurisdiction over a parent corporation will give a state personal jurisdiction over a nonresident subsidiary corporation if the parent so

16

controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence[.]").

In *Anwar v. Dow Chemical Company*, 876 F.3d 841 (6th Cir. 2017), the court characterized the alter-ego test under federal law as requiring the plaintiff to "demonstrate 'unity of interest and ownership' that goes beyond mere ownership' and shared management personnel." *Id*. at 849 (brackets omitted) (quoting *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015)). The Sixth Circuit has identified several relevant factors for deciding whether the alter-ego theory of personal jurisdiction applies:

> (1) sharing the same employees and corporate officers; (2) engaging in the same business enterprise; (3) having the same address and phone lines; (4) using the same assets; (5) completing the same jobs; (6) not maintaining separate books, tax returns and financial statements; and (7) exerting control over the daily affairs of another corporation.

*Estate of Thomson*, 545 F.3d at 362-63. A similar non-exhaustive list of factors are considered under Michigan law: "shared office space, shared board membership, interconnected revenue and capital, support from the parent for the subsidiary in the event of undercapitalization, payroll management, direction of policy and decisions, and shared projects that the parent considers to be its own." *Anwar*, 876 F.3d at 851 (citing *United Ins. Grp Agency, Inc. v. Patterson*, No. 299631, 2011 WL 5067251, at *2 (Mich. Ct. App. Oct. 25, 2011) (citing *Seasword v Hilti, Inc.*, 537 N.W.2d 221, 224 n.10 (Mich. 1995) and *Herman v. Mobile Homes Corp.*, 26

17

N.W.2d 757, 760 (Mich. 1947)).  Nevertheless it is difficult to set forth an

exhaustive list of factors relevant to whether corporate formalities should be

respected due to "the infinite variety of fact situations that may arise."  *Wm.*

*Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d

Cir. 1991); *see also Midwest Precision Heating & Cooling v. NLRB*, 408 F.3d 450,

459 (8th Cir. 2005) ("[W]e recognize the test of alter ego status is a flexible one,

such that lack of … any particular factor will not bar a finding of alter ego status.")

(quotation marks and citation omitted).  The focus is on the degree to which one

entity controls the other.  *See Anwar*, 876 F.3d at 849 (quoting *Ranza*, 793 F.3d at

1073) (explaining that the alter-ego theory requires evidence "'that the parent

controls the subsidiary to such a degree as to render the latter the mere

instrumentality of the former … exercising pervasive control over the subsidiary

… from broad policy decisions to routine matters of day-to-day operation.'")

(original brackets omitted).

Viewing the pleadings and evidence in Plaintiff's favor, the Court concludes

that he has satisfied his "relatively slight" burden and made a prima facie showing

that personal jurisdiction exists over GMCIC based on the alter-ego theory.  On the

surface, GMCIC appears separate from GM.  The corporations, according to Mr.

Treme and Ms. Vinueza, maintain separate offices, phone lines, bank accounts,

funds, records, Boards of Directors, and labor relations and human resources

18

departments.  However, it appears that the individuals who control GMCIC are in fact GM employees assigned to work in China.  The administrative chains of command and organizational structure reflect that operational control over GMCIC is the senior management of GM.

Mr. Treme states that GMCIC has its own Board of Directors, which "is the highest authority of GMCIC and directs the overall management, supervision, and control of the business[.]"  (Treme Decl. ¶ 7, ECF No. 58-1 at Pg ID 1181.)  Yet GMCIC has not identified the individuals who sit on its Board of Directors, aside from Ms. Vinueza.  (*See* Vinueza Aff. ¶ 3, ECF No. 58-2 at Pg ID 1202.)  As Plaintiff points out, Ms. Vinueza and Mr. Treme never reveal in their declarations whether they are GM or GMCIC employees.  Further, Plaintiff indicates that the budget and spending for the laboratories he managed while at GMCIC were controlled by GM.

The top officials and managers at GMCIC serve similar positions at GM. For example, Mr. Tsien serves as the President of GMCIC and as Executive Vice President of GM.  He reports to Ms. Barra, GM's Chairman and CEO, who also is listed as the top of the "Leadership" of GMCIC.  The degree to which GMCIC's and GM's managers overlap makes it difficult to conclude that their decisions are independent.  And even where supervisory personnel do not share dual roles, it appears that they report directly to individuals at GM.  For example, while serving

19

as GMCIC's Human Resources Director, Mr. Treme reported directly to John J. Quattrone, Senior Vice President, Global Human Resources for GM.

Plaintiff's evidence further reflects that GM regularly shifts managerial and supervisory personnel between the two companies.  For example, Plaintiff was transferred from GM to GMCIC, and so was his replacement.  Plaintiff's move to GMCIC was handled directly by two GM managers in the United States.  Further, the announcement of his retirement was signed by Ms. Charon and Mr. Fraser, a GM Director in the United States working in Detroit, Michigan.  This Court already has found evidence suggesting that the employment decisions relevant to Plaintiff's lawsuit were made by GM employees in Michigan.

While GMCIC claims it maintains separate offices from GM, the Court cannot ignore that the GM flag is flown out front and the building's sign bears the GM logo and states that it is *GM's* "International Operations and China Headquarters."  Further, GMCIC's website suggests that it and GM are part of a single, unitary enterprise.  The Intellectual Property Rights Agreement incorporated into Plaintiff's GMCIC employment contract also suggests a lack of corporate independence.  And the choice-of-law provision in that agreement, "though alone insufficient to establish jurisdiction, can 'reinforce a deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there.'"  *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000)

20

(quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 482 (1985)).  None of these facts independently establish an alter-ego relationship.  However, when considered along with the evidence of common management and control, they support a prima facie case for personal jurisdiction under the alter-ego theory.

For these reasons, the Court denies GMCIC's motion to dismiss for lack of personal jurisdiction.

### B.    Whether Plaintiff's Claims Against GMCIC are Subject to Dismissal Under Rule 12(b)(6)

#### i.    Title VII and ADEA

GMCIC argues that Plaintiff's Title VII and ADEA claims against it must be dismissed because it is not controlled by GM and these statutes do not apply to foreign employers with employees outside of the United States, unless the foreign employer is controlled by an American employer.  *See* 29 U.S.C. § 623(h)(2); 42 U.S.C. § 2000e-1(c)(2).  GM made the same argument in seeking dismissal of Plaintiff's claims against it.  The Court denied GM's motion, concluding that Plaintiff alleges enough facts to establish that GM and GMCIC are a single employer and that, therefore, Plaintiff was employed by a foreign company controlled by a United States company.  (Op. & Order at 12 & n.4, ECF No. 34 at Pg ID 880.)  For the reasons discussed in that decision and in the subsection above, the Court concludes that Plaintiff's Title VII and ADEA claims against GMCIC also are not subject to dismissal.

21

### ii.    ELCRA

GMCIC argues that Plaintiff's ELCRA claim against it must be dismissed

because China's interest in applying its laws outweigh Michigan's interest in

applying its laws in this instance.  "Federal courts exercising supplemental

jurisdiction must apply the forum state's choice of law rules to select the applicable

state substantive law."  *Osborn v. Griffin*, 865 F.3d 417, 443 (6th Cir. 2017)

(citations omitted).  Under Michigan's choice-of-law rules, the State's laws are

presumed to apply unless "a 'rational reason' to do otherwise exists."  *Sutherland*

*v. Kennington Truck Serv., Ltd.*, 562 N.W.2d 466, 471 (Mich. 1977).  To make this

determination, courts first must decide "if any foreign state has an interest in

having its law applied."  *Id*.  "If no state has such an interest, the presumption that

Michigan law will apply cannot be overcome.  If a foreign state does have an

interest in having its law applied," the court must "determine if Michigan's

interests mandate that Michigan law be applied, despite the foreign interests."  *Id*.

GMCIC argues that "[c]ourts analyzing Michigan choice of law rules have

repeatedly found that 'a foreign state undeniably has an interest in having its law

applied to an action filed by one of its citizens stemming from injury sustained

there.'"  (Def.'s Mot. at 18, ECF No. 58 at Pg ID 1175 (emphasis removed)

(quoting *Std. Fire Ins. Co. v. Ford Motor Co.*, 723 F.3d 690, 695 (6th Cir. 2013)).)

Although this Court found no reason to not apply the ELCRA when deciding GM's

motion to dismiss, GMCIC points out that GM never suggested that another forum has an overriding interest in having its law applied.  GMCIC maintains that China has an overriding interest in having its law applied in this case as GMCIC is a Chinese corporation operating pursuant to the laws of China and its alleged conduct occurred while Plaintiff lived and worked in China.  GMCIC argues that cases finding that Michigan had an interest that mandated application of Michigan law are distinguishable as the underlying action giving rise to the lawsuit occurred in Michigan.

GMCIC has not identified the law of China that it believes should apply to this litigation.  It is unclear whether China provides for the civil rights protections asserted by Plaintiff here.  For this reason, this case is very different than those cited by GMCIC.  Where courts engage in a choice-of-law analysis, it is always clear what the choices are.  It is difficult for this Court to find that China has a strong interest in having its law applied without knowing what that law provides.  Moreover, a court need only engage in a choice-of-law analysis when a difference in law will make a difference to the outcome.  *New Hampshire Ins. Co. v. Carleton*, 502 F. App'x 478, 481 (6th Cir. 2012); *Asher v. Unarco Material Handling, Inc.*, 737 F. Supp. 2d 662, 667 (E.D. Ky. 2010) (citing *Williams v. Toys "R" Us*, 138 F. App'x 798, 803 (6th Cir. 2005) ("The Court only needs to go through the choice of law analysis when a conflict occurs between two states'

laws.).  But even if China has some interest in having its law govern, the Court

concludes that it does not override the presumption that Michigan law should apply

and Michigan's interest in having its law applied.

Plaintiff, a United States citizen since 1999, lived in the United States (the

evidence suggests Michigan) from 1991 until 2009, when he transferred to his job

assignment in China.  He was offered the GMCIC position while a Michigan

resident.[4]  Plaintiff returned to his home in the State after his employment in China

was terminated.  Plaintiff claims that GM controlled GMCIC and that the decision

to terminate his position with GMCIC was made from GM's Michigan

headquarters.  While Plaintiff was in China when he was mandatorily retired, he

has experienced the effects of the decision back in Michigan.

---

[4] GMCIC relies on the statement in *Standard Fire* that "a foreign sovereign undeniably has an interest in having its law applied to an action filed by one of its *citizens* stemming from injury there."  723 F.3d at 695 (emphasis added).  Plaintiff, however, was not a citizen of China when he worked for GMCIC.  He held only U.S. citizenship.  In *Standard Fire*, as well as other cases conducting choice-of-law analyses, the courts also speak to the "residency" of the parties; however, it is unclear whether they are equating residence with citizenship.  "Citizenship … turns on domicile.  Domicile, a legal term of art, requires that a person both be present in a state and have the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere.  *See, e.g., Prime Rate Premium Fin. Corp., Inc. v. Larson*, 930 F.3d 759, 765 (6th Cir. 2019) (internal quotation marks and citations omitted).  The evidence suggests that Plaintiff did not intend to make China his home indefinitely and planned to return to Clarkston, Michigan, eventually, where he maintained a residence.

Moreover, Michigan has a strong interest in the enforcement of its civil rights laws. The State's interests include the prevention of discriminatory employment decisions made by Michigan corporations concerning resident employees, as well as those made for the corporations' oversees employees and employees of any entity controlled by a Michigan corporation. Plaintiff presents sufficient evidence to determine for purposes of GMCIC's motion to dismiss that GM controls GMCIC and, from its Michigan headquarters, made the alleged discriminatory decision to terminate Plaintiff's employment. Refusing to apply Michigan's civil rights statute in this instance could encourage employers with oversees operations seeking to terminate employees for unlawful reasons to move those employees outside the forum's reach and then execute the unlawful employment action.

In short, the Court is not convinced that China has an interest in applying its law to this dispute. In any event, the matter has connections to Michigan beyond the fact that the alleged discriminatory employment decisions were made within its borders such that the State's interest in having its law applied outweigh any interest of China.

Accordingly,

**IT IS ORDERED** that GMCIC's Motion to Dismiss (ECF No. 58) is

**DENIED**.

**IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: August 4, 2020